UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT FRANKFORT
*Electronically filed*

**COMMONWEALTH OF KENTUCKY**,

    *Plaintiff*

v.

**UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES**; and

**XAVIER BECERRA,** in his official capacity as Secretary of the United States Department of Health and Human Services,

    *Defendants*

Civil Action No. \_\_\_\_

---

## COMPLAINT

---

1.    In a move completely untethered from Congressional authorization and ignoring the constitutional restraints on federal power, the U.S. Department of Health and Human Services ("HHS") has promulgated the final rule, *Designated Placement Requirements Under Titles IV-E and IV-B for LGBTQI+ Children*, 89 Fed. Reg. 34,818 (Apr. 30, 2024) (the "Placement Mandate" or "Final Rule"), Exhibit A. This Final Rule requires the State agencies responsible for foster care to "ensure" they have foster care providers who will support a child's purported "lesbian, gay, bisexual, transgender, queer or questioning, intersex, . . . non-binary, Two-Spirit, or

. . . non-conforming gender identity or expression." *Id*. at 34,825–26. States must have enough of these providers that they could place a child with one of them any time a child requests "or would benefit from such a placement." *Id*. at 34,859. Additionally, the Placement Mandate requires that States offer to place children according to their asserted gender identity or status rather than sex. *Id*. A failure to do so constitutes a violation of the Final Rule. *Id*. at 34,837. Likewise, the Placement Mandate characterizes a failure to provide access to resources, activities, and peers "supportive" of a child's asserted gender identity or status as prohibited retaliation. *See id*. at 34,835.

2.    The Placement Mandate (1) exceeds the authority given to HHS and the Secretary, (2) violates the Spending Clause, and (3) is arbitrary and capricious.

3.    The Plaintiff, the Commonwealth of Kentucky, by and through its Attorney General, seeks judicial relief from the unlawful and unconstitutional Placement Mandate.

## PARTIES

### I.    Plaintiff

4.    The Commonwealth of Kentucky is a sovereign State of the United States of America. The Attorney General of the Commonwealth of Kentucky is authorized to bring legal actions on behalf of the Commonwealth and its citizens. Ky. Rev. Stat. § 15.020. The Attorney General is "charged with the duty of protecting the interest of all the people," *Hancock v. Terry Elkhorn Mining Co.*, 503 S.W.2d 710, 715 (Ky. 1973), including by ensuring that government actors perform their duties

lawfully, *see Commonwealth ex rel. Beshear v. Bevin*, 498 S.W.3d 355, 362 (Ky. 2016); *see also Cameron v. EMW Women's Surgical Ctr., PSC,* 595 U.S. 267, 278 (2022) (recognizing the Attorney General is "deemed Kentucky's 'chief law officer' with the authority to represent the Commonwealth 'in all cases'").

## II. Defendants

5. Defendant Department of Health and Human Services is an executive department, 5 U.S.C. § 101, located in the District of Columbia. As an executive department, HHS is subject to the Administrative Procedure Act.

6. Defendant Xavier Becerra is the Secretary of HHS. As Secretary, he has statutorily mandated roles relating to the State plans for foster care assistance and child welfare services. 42 U.S.C. §§ 622(a), 671.

JURISDICTION AND VENUE

7. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1361, and 5 U.S.C. §§ 702–03.

8. The Court is authorized to award the requested declaratory and injunctive relief under 5 U.S.C. §§ 702 and 706, 28 U.S.C. § 1361, the U.S. Constitution, and the Court's equitable powers.

9. Venue is proper within this District under 28 U.S.C. § 1391(b)(2). The Defendants are a United States agency and an officer sued in his official capacity. Plaintiff Commonwealth of Kentucky is a resident of every judicial district in its sovereign territory, including this judicial district and division.

10.    The Central Division of the Eastern District of Kentucky is a proper division for this action because a substantial part of the events giving rise to this action occurred in the division. Both the Attorney General and the Commonwealth's agency overseeing foster care maintain physical offices in Frankfort, Kentucky, which is in this division. No defendant resides in the Commonwealth.

## BACKGROUND

### I.    The Cooperative Federalism of Foster Care

11.    Since 1961, the federal government has shared the cost of foster care services with the States. Initially, this occurred as part of the federal welfare program, Aid to Families with Dependent Children, which the Supreme Court characterized as "a scheme of cooperative federalism." *King v. Smith*, 392 U.S. 309, 316 (1968). The federal government funded the program, but it was administered by the States. *Id*.

12.    After 1980, foster care funds have been authorized separately under Titles IV-E and IV-B of the Social Security Act. These statutes retained the cooperative system between the federal government and the States.

13.    Under Title IV-E, Congress allows States to claim partial federal reimbursement for the cost of providing foster care to children who meet federal eligibility criteria. 42 U.S.C. § 670, *et seq*. Reimbursed costs under Title IV-E include payments to foster care providers on behalf of eligible children, and funds for training, data collection, and other costs of program administration. 42 U.S.C. § 674. For fiscal

year 2023, HHS reported reimbursement claims for over $5 billion under Title IV-E foster care programs.

14.    Eligibility for reimbursement requires a State to submit a detailed plan for approval by the Secretary of HHS. 42 U.S.C. § 671(a)(1)–(37).

15.    Approval by the Secretary is not discretionary. So long as the State plan adheres to the requirements instituted by Congress, the Secretary must approve the plan. *See* 42 U.S.C. § 671(b) ("The Secretary *shall* approve any plan which complies with the provisions of subsection (a)." (emphasis added)).

16.    The requirements instituted by Congress include that the State plan must provide for a State authority "that shall be responsible for establishing and maintaining standards for foster family homes and child care institutions." 42 U.S.C. § 671(a)(10)(A). Similarly, Congress requires the State plan to provide that "*the State* shall develop and implement standards to ensure that children in foster care placements in public or private agencies are provided quality services that protect the safety and health of the children." *Id.* at § 671(a)(22) (emphasis added).

17.    This language in Title IV-E makes it unmistakably clear that *States* are the authors of the substantive standards for foster family homes and childcare institutions.

18.    Title IV-B, which relates to "child welfare services," also envisages a cooperative system between the States and the federal government. Congress stated that the purpose of the first subpart of Title IV-B is to "promote State flexibility in the development and expansion of a coordinated child and family services program

5

that utilizes community-based agencies and ensures all children are raised in safe, loving families." 42 U.S.C. § 621. Similarly, the purpose of the second subpart of Title IV-B is to "enable States to develop and establish, or expand, and to operate . . . family reunification services" to "address the problems of families whose children have been placed in foster care." 42 U.S.C. § 629. These purposes demonstrate Congress intended for States to develop and operate the welfare services.

19.     And although Title IV-B calls for a State plan for child welfare services "which has been developed jointly by the Secretary and the State agency." 42 U.S.C. § 622(a), the jointly-developed plan must meet the requirements of subsection (b) and, in that subsection, Congress makes clear that any substantive standards are to be set by the State. For instance, the State plan must provide that "*the State* will develop . . . a plan for the ongoing oversight and coordination of health care services for any child in foster care placement, which shall ensure a coordinated strategy to identify and respond to the health care needs of children in foster care placements, including mental health and dental health needs." *Id*. at § 622(b)(15)(A) (emphasis added). Similarly, the State plan must "describe *the State* standards for the content and frequency of caseworker visits for children who are in foster care." *Id*. at § 622(b)(17) (emphasis added).

## II.    The Placement Mandate

20.     Contrary to both Congress' intent and the text of the Social Security Act, the Placement Mandate imposes substantive standards for foster care placements on the States.

21.    Under the Placement Mandate, State Title IV-E/IV-B agencies must agree to provide foster care for children asserting a gender identity or status different than their sex in a manner consistent with the Secretary's policy choices concerning gender dysphoria care and treatment. Specifically, the State agencies "must ensure there is a Designated Placement available for all LGBTQI+ children in foster care who request or would benefit from such a placement." Final Rule at 34,859; *see also id.* at 34,827 ("State and tribal agencies must have available a sufficient number of these [Designated Placements] as part of their responsibilities to satisfy the statutory requirement that all children in foster care can have access to a safe and appropriate placement.").

22.    State Title IV-E/IV-B agencies must provide notice of the availability of designated placements to all children fourteen and over, as well as any child under 14 years old who was removed from the home, in whole or in part, due to "familial conflict about their sexual orientation, gender identity, gender expression or sex characteristics," who "have disclosed their LGBTQI+ status or identity or whose LGBTQI+ status or identity is otherwise known to the agency." *Id.* at 34,859–60.

23.    The Final Rule says that a State Title IV-E/IV-B agency "will be in violation of this rule if it refuses to offer a child a placement consistent with their [sic] gender identity." *Id.* at 34,837.

24.    To qualify as a Designated Placement, the foster care provider must (1) "[c]ommit to establish an environment that supports the child's LGBTQI+ status or identity," (2) "[b]e trained with the appropriate knowledge and skills to provide for

7

the needs of the child," and (3) "[f]acilitate the child's access to age-or developmentally appropriate resources [and] services." *Id*. at 34,859.

25.    The State Title IV-E/IV-B agencies "must ensure" that the services offered to the child are "supportive" of the child's asserted sexual orientation and gender identity or other expression and that they include "clinically appropriate mental and behavioral health supports" that are "supportive of [the child's] sexual orientation and gender identity and expression." *Id*. at 34,860. "Attempts to undermine, suppress, change, or stigmatize a child's sexual orientation or gender identity or expression through conversion therapy" are defined in the Final Rule as prohibited retaliation. *Id*. at 34,836, 84,860.

26.    HHS also explicitly notes that restricting access to "supportive peers"— *i.e.*, peers who support the child's asserted gender identity or status—constitutes retaliation under the Final Rule. *Id*. at 34,835.

27.    The retaliation definitions apply not only to providers who opt to be Designated Placements, but also to the State agencies and "any provider." *Id*. at 34,860.

28.    The Final Rule also prohibits "harassment," which includes "conduct that so undermines or detracts from the [child's] experience." *Id*. at 34,828; 34,860.

29.    State agencies must have a process for children to report concerns about a placement failing to meet these requirements. *Id*. at 34,860.

30.    The Placement Mandate also requires State agencies to train caseworkers, supervisors, and foster care providers on how to appropriately serve the

children asserting a gender identity or status inconsistent with their sex and on how to implement the procedural requirements of the Rule. *Id*. at 34,820; 34,860.

## III.   Injury to Kentucky

### A. Foster Care in Kentucky

31.    In each of the last five years, there have been more than 8,000 children in foster care in Kentucky. *See* Declaration of Christopher Thacker, Exhibit B. As of January 2024, Kentucky had 8,047 children in foster care. At the same time, there were 4,624 foster homes in the Commonwealth. Of these, over half—2,638—were homes utilizing private-child-placing agencies ("PCP"). *Id*. PCP homes have made up over 55% of Kentucky's foster care homes for each of the last five years. *Id*.

32.    In January 2024, there were 38 congregate care facilities in Kentucky. *Id*. Of the 38 congregate care facilities, 21 (or 55%) serve only one sex. *Id*. Kentucky's Cabinet for Health and Family Services ("CHFS")—the agency responsible for managing foster care in the Commonwealth—contracts with non-profits to operate all the congregate care facilities. *See id*.

33.    For fiscal year 2023,[1] Kentucky was allotted $8,986,540 in federal funds under Title IV-B. *Id*. In the same fiscal year, Kentucky submitted claims under Title IV-E for $228,063,499, of which the federal share of the claims covered two-thirds ($154,756,299). *Id*. These Title IV-E claims included funds for foster care

---

[1]    This is the most recent year for which there was complete data on all related programs.

maintenance payments totaling $28,703,940, as well as $42,464,572 for foster care administration and $4,259,081 for foster care training. *Id.*

34.    Kentucky has enacted laws and regulations to govern foster care. The General Assembly enacted a statutory scheme for foster care enumerating the rights of foster parents and of children in the Kentucky foster care system, Ky. Rev. Stat. §§ 620.360, 620.363, and establishing a system for caring for children who need to be placed in foster care, including directions for CHFS to promulgate necessary regulations. *See* Ky. Rev. Stat. §§ 199.640; *see also id.* at §§ 462 to 199.467; *id.* at §§ 620.190 to 620.365. CHFS has enacted regulations. *See, e.g.,* 922 Ky. Admin. Reg. 1:305 (governing licensure of child-placing agencies); 922 Ky. Admin. Reg. 1:310 (establishing standards for child-placing agencies when placing children in state custody).

### B. The Impact of the Placement Mandate on Kentucky

35.    The Placement Mandate became effective on July 1, 2024, and by October 1, 2026, State Title IV-E and IV-B agencies must implement its provisions. Final Rule at 34,818.

36.    The Placement Mandate causes an injury-in-fact to Kentucky as an object of the rule. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992).

37.    CHFS is the Commonwealth's Title IV-B and IV-E agency.[2] As such, it is responsible for the State plan required under those titles and for licensing foster care providers.

38.    The Placement Mandate clearly imposes requirements on CHFS:

- "The title IV-E/IV-B agency must ensure there is a Designated Placement available for all LGBTQI+ children in foster care who request or would benefit from such a placement." Final Rule at 34,859.

- "The IV-E/IV-B agency must implement a process by which an LGBTQI+ child may request a Designated Placement." *Id.*

- "The title IV-E/IV-B agency must implement a process for LGBTQI+ children to report concerns about a placement that fails to meet the applicable requirements of this section and to report concerns about retaliation." *Id.* at 34,860.

- "The Title IV-E/IV-B agency must ensure that LGBTQI+ children have access to age- or developmentally appropriate services that are supportive of their sexual orientation and gender identity or expression, including clinically appropriate mental and behavioral health supports." *Id.*

- "When considering placing a child, the title IV-E/IV-B agency must offer the child a placement consistent with their [sic] gender identity." *Id.*

- The title IV-E/IV-B agency must "[e]nsure that its employees who have responsibility for placing children in foster care, making placement decisions, or providing services" are trained to implement the procedural requirements of this section, and "[e]nsure that all placement providers are informed of the procedural requirements to comply with this section, including the required non-retaliation provision." *Id.*

---

[2]    *See Child and Family Services Plan*, CABINET FOR HEALTH AND FAMILY SERVICES, https://perma.cc/92CP-V53D (last visited Jan. 17, 2025).

39.    As "the object of" the Final Rule's requirements, "there can be 'little question' that the rule [injures] the States." *W. Va. v. EPA*, 597 U.S. 697, 719 (2022) (citing *Lujan*, 504 U.S. at 561–62). To meet the injury requirement of standing, Kentucky needs to show nothing else. *See Kentucky v. Fed. Hwy. Admin.*, 728 F. Supp. 3d 501, 507 (W.D. Ky. 2024) ("No additional proof is necessary when a rule purports to impose legal obligations directly on a state plaintiff.").

40.    Even so, Kentucky can easily show it will be harmed by the costs of the Final Rule. HHS has identified several costs to the State agencies. First, HHS acknowledges that to comply with the requirement that State agencies have enough Designated Placement providers, agencies will "likely need to increase the recruitment of providers who are qualified to provide safe and appropriate affirming care." Final Rule at 34,855. Second, HHS identified "[t]raining agency caseworkers and supervisors on the procedural requirements in the final rule . . . and training placement providers seeking to become designated as a designated placement provider" as a cost for State Title IV-E/IV-B agencies. *Id*. According to HHS, the States will incur nearly $35 million in costs between 2027 and 2029 to implement the Placement Mandate and to recruit additional foster care providers. *Id*. at 34,858.

41.    Beyond these costs, State agencies will incur costs as they establish the procedures and processes required by the Placement Mandate. For instance, the Placement Mandate requires Title IV-E/IV-B agencies to "implement a process" through which a child "may request a Designated Placement." *Id*. at 34,859. Further, State agencies will have to determine how they will provide the notice to children

about the option of a Designated Placement mandated by the Rule. *See id*. at 34,859–60. State agencies also "must implement a process" for children to report concerns. *Id*. at 34,860. The Placement Mandate also requires Title IV-E/IV-B agencies to have a procedure to ensure neither the agency nor any provider engages in retaliation as defined by the Placement Mandate. *Id*. Still more, the agencies "must ensure" that children have access to "services that are supportive of their sexual orientation and gender identity or expression, including clinically appropriate mental and behavioral health supports." *Id*. Instituting and implementing all these processes and provisions will impose costs on Kentucky, who must create or modify processes to comply. *See* Thacker Declaration, Exhibit B (explaining that CHFS said it possessed no records discussing the language to be used for the written notification required by the Placement Mandate or discussing the process for children to report concerns about placements and retaliation, indicating Kentucky must spend time and manpower to establish and implement these requirements).

42.    Kentucky is also injured by the Placement Mandate because it will force Kentucky to forgo implementation of its laws and regulations. For instance, Kentucky will be restricted in its ability to preserve single-sex spaces in foster care settings. Under the Final Rule, a State agency will violate the Placement Mandate if the agency refuses to offer a child a placement consistent with his or her purported gender identity. Final Rule at 34,837. But Kentucky has laws and regulations requiring single-sex bathrooms and living spaces for children. *See, e.g.,* 922 Ky. Admin. Reg. 1:310 § 4(3)(q)3. ("Children of different genders over the age of five (5)

shall not share a bedroom unless an exception has been granted to facilitate the placement of a sibling group or children who are related and share a sibling-like relationship . . . and no high-risk behaviors are present"); Ky. Rev. Stat. § 158.189(3) (requiring school boards to have policies limiting the use of restrooms, locker rooms, and shower rooms by a single sex).

43.    These State laws and regulations reflect the Commonwealth's interest in protecting the privacy and safety of children. *See, e.g.,* Ky. Rev. Stat. § 158.189(2) (recognizing children have "natural and normal concerns about privacy while in various states of undress"). Courts have routinely recognized that "[t]he need for privacy justifies separation and the differences between the genders demand a facility for each gender that is different." *Faulkner v. Jones*, 10 F.3d 226, 232 (4th Cir. 1993); *see also United States v. Virgini*a, 518 U.S. 515, 550 n.19 (1996) ("Admitting women to [Virginia Military Institute] would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements.").

44.    HHS says the Placement Mandate does not preempt state or tribal laws relating to sex-separate spaces. Notwithstanding this assertion, the Final Rule means that States are put to the choice of following the Rule or their own policies with respect to preserving single-sex spaces for children. States are injured when they cannot enforce their duly enacted laws. *See, e.g., Priorities USA v. Nessel*, 978 F.3d 976, 980 (6th Cir. 2020); *Kentucky v. Biden*, 23 F.4th 585, 598 (6th Cir. 2022) (explaining "States have a sovereign interest to sue" based on federal preemption of state law).

14

45.    Finally, the States will be injured by the loss of funding. As HHS notes in the preamble to the Final Rule, "[i]n order to receive title IV-E and IV-B funds, agencies must have plans approved by [HHS]." Final Rule at 34,820. HHS and the Secretary assert that the mandates of the Final Rule "must be included" in the State plan that HHS "must review and approve." *Id*. at 34,842. Therefore, any State plan that does not include the requirements of the Placement Mandate will not be approved and the State will not receive federal funds. Federal funding accounts for over half of State foster care budgets.[3] For example, the federal share of Kentucky's Title IV-E foster care claims for fiscal year 2023 was 61%. *See* Thacker Declaration, Exhibit B. The loss of such funding is a significant injury.

## COUNT I
## HHS does not have authority to impose the Placement Mandate.

46.    Kentucky incorporates by reference the allegations in paragraphs 1 to 45, above, as if fully stated herein in their entirety.

47.    While Congress has "great latitude in exercising its powers," *NFIB v. Sebelius*, 567 U.S. 519, 537 (2012), "[a]gencies have only those powers given to them by Congress," *W. Va. v. EPA*, 597 U.S. at 723.

48.    When interpreting a statute "that confers authority upon an administrative agency, th[e] inquiry must be 'shaped, at least in some measure by . . .'

---

[3]    *Child Welfare: Purposes, Federal Programs, and Funding,* CONGRESSIONAL RESEARCH SERVICE (May 16, 2024), https://sgp.fas.org/crs/misc/IF10590.pdf (explaining that under Title IV-E, "the federal government is committed to paying a part of the cost of that aid (50% to 83%, depending on the state/tribe), as well as a part of the cost of administering the program (50% in all states/tribes) and for certain training (75% in all states/tribes)," and under Title IV-B, the federal government will pay $3 for every $1 spent by the State).

whether Congress in fact meant to confer the power the agency has asserted." *Id.* at 721 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000)).

49.    In the preamble to the Final Rule, HHS explains that in promulgating the Rule:

> We implement the[ ] statutory requirements for safe and proper care, placement in appropriate settings, appropriate and quality services, and adequate preparation of placement providers by requiring that LGBTQI+ children must be offered placements with providers who are committed to establishing an environment that supports their LGBTQI+ status or identity, trained to provide for their needs, and will facilitate their access to appropriate services that support their health and well-being.

Final Rule at 34,850.

50.    Similarly, HHS asserts that the Final Rule "meets Federal statutory guarantees that each child in foster care will receive safe and proper care that is consistent with the best interest and special needs of the child." *Id.* at 34,819.

51.    What is clear from these assertions is that HHS and the Secretary fundamentally misunderstand (or worse, misconstrue) their roles under the enabling legislation.

52.    The enabling legislation—the Social Security Act—is abundantly clear that Congress did not give HHS and the Secretary either the authority to establish federal substantive standards for foster care or to require that States treat a child's purported gender identity or status as dispositive for foster care placement.

## A. HHS and the Secretary have no authority to impose substantive standards for foster care.

53.    Under the Social Security Act, the States—not HHS or the Secretary—establish the substantive standards for foster care.

54.    "The powers not delegated to the United States by the Constitution . . . are reserved to the States respectively, or to the people." U.S. Const. amend. X.

55.    Foster care falls squarely within the purview of State police powers. *See, e.g., J.B-K. by E.B. v. Sec'y of Ky. Cabinet for Health & Fam. Servs.*, 48 F.4th 721, 724 (6th Cir. 2022) ("Kentucky law governs Kentucky's foster care system."); *Haaland v. Brackeen,* 599 U.S. 255, 372, 378 (2023) (Alito, J., dissenting) (explaining it has been long recognized that decisions about foster care "are core state functions," and that it is "a most important aspect of federalism" that domestic familial relations are "matters reserved to the States and do not belong to the United States") (quoting *Williams v. North Carolina*, 325 U.S. 226, 233 (1945)).

56.    Neither Congress nor HHS can flout "restraints on federal power that the Constitution carefully constructed." *See NFIB*, 567 U.S. at 538.

57.    Indeed, in recognition of such restraints, Congress wrote the Social Security Act to ensure the States have the leading role in determining standards for foster care provision.

58.    Under Title IV-E, the "standards for foster family homes and child care institutions" are to be "establish[ed]," "maintain[ed]," and "applied" by the "State authority." 42 U.S.C. § 671(a)(10). These standards cover "admission policies, safety, sanitation, and protection of civil rights." *Id.*

17

59.    Indeed, the language of "assuring that the child receives safe and proper care" is found in the definition of "case plan," *id*. at § 675(1), and the case plans are created by the States, *id*. at § 671(a)(16) (requiring States to provide in their State plans "for the development of a case plan (as defined in section 675(1) of this title and in accordance with the requirements of section 675a of this title) for each child receiving foster care maintenance payments"). Similarly, the language of "best interest and special needs of the child" is found in the definition of "case review system," *id*. at § 675(5), and the case review system is something *the State* is to provide for in the State plan, *id*. at § 671(16).

60.    It is immediately clear then that the purported focus of the Placement Mandate—establishing requirements to ensure the "safe and proper care" of children, Final Rule at 34,850—is squarely within the scope of authority explicitly assigned to the States.

61.    Other sections of Title IV-E and Title IV-B support this understanding. At one point, Title IV-E says, "*the State* shall develop and implement standards to ensure that children in foster care placements in public or private agencies are provided quality services that protect the safety and health of the children." *Id*. at § 671(a)(22) (emphasis added). At another, it says the State plan must provide "that the State shall consider giving preference to an adult relative . . . when determining a placement for a child, provided that the relative caregiver meets all relevant *State* child protection standards." *Id*. at § 671(a)(19) (emphasis added).

18

62.    Moreover, while the Secretary is directed to "issue guidance to States regarding the practices criteria required for services or programs" for which the States can use federal funds, 42 U.S.C. § 671(e)(4)(D), it is the States who select the services and programs, *id*. at § 671(e)(5)(A), (B)(iii)(III) (requiring State plans to describe "how the State selected the services or programs").

63.    Training is likewise assigned to the States. For training foster care parents, Congress simply requires the State plan to include a certification that the State will ensure prospective foster parents are trained according to the general parameters set by Congress. *See* 42 U.S.C. § 671(a)(24) (requiring States to certify that "prospective foster parents will be prepared adequately with the appropriate knowledge and skills to provide for the needs of the child . . . and that the preparation shall include knowledge and skills relating to the reasonable and prudent standard for the participation of the child in age or developmentally-appropriate activities . . . and knowledge and skills relating to applying the standard to decision such as whether to allow the child to engage in social, extracurricular, enrichment, cultural, and social activities. . . ."). For training caseworkers, the Act simply requires the State plans to include a description "of how the State will provide training . . . for caseworkers in assessing what children and their families need . . . and overseeing and evaluating the continuing appropriateness of the services." 42 U.S.C. § 671(e)(5)(B)(viii). Nothing in either of these provisions on training evinces a role for the Secretary to require certain types of training or specify what the training must teach.

19

64.     In fact, under Title IV-E, Congress clearly gave HHS and the Secretary a secondary role. Even when assigning the Secretary responsibility to approve the State plans, Congress specified that the "Secretary *shall* approve any plan which complies with the provisions of subsection (a) of this section." 42 U.S.C. § 671(b) (emphasis added). Thus, this is not a discretionary role—and this language gives no leeway for the Secretary to institute additional requirements for the States on which he can condition approval.

65.     Further, to the extent the Secretary is to "identif[y]" "model standards," States cannot be forced to comply. *Id.* at § 671(a)(36) (providing that if a State deviates from the "model standards" the Secretary identifies for licensing, the State only needs to submit to the Secretary "the reason for the specific deviation and a description as to why having a standard that is reasonably in accord with the corresponding national model standards is not appropriate for the State.").

66.     Title IV-B similarly reserves the establishment of substantive standards of care to the States. Although this title requires States to have a plan that is "developed jointly by the Secretary and the State agency," 42 U.S.C. § 622, substantive development is left to the States. *See* 42 U.S.C. § 622(b)(15) ("The State will develop, in coordination and collaboration with the State agency . . . and in consultation with pediatricians, other experts in health care, and experts in and recipients of child welfare services, a plan for the ongoing oversight and coordination of health care services."); *id.* at § 622(b)(17) (calling for a description of *State* standards for caseworker visits).

20

67.     HHS defies all of this in the Placement Mandate by establishing a new standard for what constitutes "safe and proper care." According to the preamble to the Final Rule, "the purpose of this rule is to clarify the specific protections necessary for LGBTQI+ youth to receive safe and proper care in an appropriate placement." Final Rule at 34,835; *see also id.* at 34,852 (explaining the Placement Mandate "elaborates on what is necessary to provide [safe and proper] care in the context of LGBTQI+ children").

68.     Under the Placement Mandate, the "safe and proper care" standard means having sufficient Designated Placements that any child asserting a gender identity inconsistent with his or her sex could be placed in one, as well as placing children according to asserted gender identity or status rather than sex. *See* Final Rule at 34,827–28; *but see* 42 U.S.C. § 671(a)(22) ("[T]he State shall develop and implement standards to ensure that children in foster care placements in public or private agencies are provided quality services that protect the safety and health of the children."); *id.* at § 671(a)(10) (assigning the responsibility for establishing, maintaining, and applying standards relating to admission into the foster care program, safety, sanitation, and protection of civil rights to the "State authority").

69.     The new standard also requires States to ensure children asserting LGBTQI+ status "have access to age- or developmentally appropriate services that are supportive of their sexual orientation and gender identity or expression, including clinically appropriate mental and behavioral health supports." Final Rule at 34,860, 34,836; *see also id.* at 34,831. And the Placement Mandate prohibits some services.

*See id.* at 34,860 (defining "[a]ttempts to undermine, suppress, [or] change . . . a child's sexual orientation or gender identity or expression through 'conversion therapy'" as prohibited retaliation); *but see, e.g.*, 42 U.S.C. § 671(e)(5)(B)(iii)(III) (requiring State plans to describe "how the State selected the services or programs"); 42 U.S.C. § 622(b)(15) ("The State will develop . . . a plan for the ongoing oversight and coordination of health care services.").

70. The standard for safe and proper care as defined in the Placement Mandate also requires training from a policy perspective chosen by the Defendants and covering content selected by the Defendants. *See* Final Rule at 34,819 (requiring foster care providers to "be trained with the appropriate knowledge and skills to provide for the needs of the child related to the child's self-identified sexual orientation, gender identity, and gender expression."); *id.* at 34,830 ("In addition to requiring the training to reflect evidence, studies, and research about the impacts of rejection, discrimination, and stigma on the safety and wellbeing of LGBTQI+ children, the final rule also requires the training to provide information for providers about professional standards and recommended practices that promote the safety and wellbeing of LGBTQI+ children."); *id.* at 34,820 ("requires training for title IV-E/IV-B agency caseworkers and supervisors on how to appropriately serve LGBTQI+ children"); *but see* 42 U.S.C. § 671(a)(24); *id.* at § 671(e)(5)(B)(viii).

71. The Placement Mandate's imposition of substantive standards on foster care is an obvious conflict with the Social Security Act. This conflict means the Defendants have exceeded their statutory authority in promulgating this Rule.

**B. HHS and the Secretary have no authority to make gender identity or status dispositive for foster care placement.**

72.    The Constitution gives the "legislative power[ ]" to Congress, not to Executive Branch agencies. U.S. Const. art. I § 1. And "enabling legislation is generally not an open book to which the agency may add pages and change the plot line." *W. Va. v. EPA*, 597 U.S. at 723 (cleaned up, citation omitted).

73.    The Defendants are changing the plot line with the Placement Mandate, which reflects a radical change from what Congress enacted. Nothing in the enabling legislation indicates Congress intended to establish any factor as dispositive for foster care placement, let alone, purported gender identity or status.

74.    While Congress does mandate some substantive requirements on the States, none of them establish substantive standards or make any factor dispositive. Under Title IV-E, Congress prohibits race-based denials, requires consideration of a preference for relatives, mandates the establishment of a procedure for criminal background checks and child abuse and neglect registry checks, and requires health insurance coverage for any child determined to have special needs. 42 U.S.C. § 671(a)(18)–(21). Title IV-B requires the State plan to "provide for the diligent recruitment of potential foster and adoptive families that reflect the ethnic and racial diversity of children in the State," *id.* at § 622(b)(7), and to develop a plan for oversight and coordination of health care services for any child in foster care, *id.* at

§ 622(b)(15).[4] None of these requirements dictate standards of care, and certainly do not establish a single factor that must be dispositive for child placement.

75.    Moreover, at no point do Title IV-B or IV-E discuss "LGBTQI+" status or identity. And to the extent Title IV-E directs consideration of "civil rights," that consideration is wholly left to the States. 42 U.S.C. § 671(a)(10).

76.    The preamble to the Final Rule says the Placement Mandate does not eliminate discretion by the States in following state laws and policies regarding the best interests of the child, but in the same paragraph it says the Final Rule clarifies that, "for LGBTQI+ foster children, the statutory case plan and case review requirements *require* access to a placement that is supportive of their LGBTQI+ status or identity." Final Rule at 34,851 (emphasis added); *see also id*. at 34,837 ("The final rule text states that, when considering placing a child, the title IV-E/IV-B agency *must* offer the child a placement consistent with their [sic] gender identity" and "a title IV-E/IV-B agency will be in violation of this rule if it refuses to offer a child a placement consistent with their [sic] gender identity." (emphasis added)).

77.    Indeed, the Final Rule identifies kinship caregivers as the only instance where even if the kinship placement is not a Designated Placement, the kinship placement would not be inconsistent with the Defendants' new standard for safe and proper care. Final Rule at 34,843.

---

4    Notably, although this provision requires consultation with pediatricians, other experts in health care, and experts in child welfare services, Congress is careful to note that this section is not to "be construed to reduce or limit the responsibility of the State agency." 42 U.S.C. § 622(b)(15)(B).

78.    The Defendants cannot expect the States or this Court to treat as optional what they refer to as mandatory.

79.    The Placement Mandate's requirement that a child's purported gender identity status or identity be the overriding factor for foster care placement has no basis in the enabling legislation. It therefore exceeds the Defendants' statutory authority.

## COUNT II
### The Placement Mandate violates the major questions doctrine.

80.    Kentucky incorporates by reference the allegations in paragraphs 1 to 79, above, as if fully stated herein in their entirety.

81.    Under the major questions doctrine, an agency's claim of authority must be clearly supported by statute before an agency can assert "'unheralded' regulatory power" over an issue of "vast economic and political significance." *W. Va. v. EPA*, 597 U.S. at 716, 722 (citation omitted); *Util Air. Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014). This is because the Constitution entrusts policymaking to Congress, not the executive branch. U.S. Const. art. I § 1. Therefore, courts will not assume that an agency has authority to address issues of "deep economic and political significance." *Biden v. Nebraska*, 600 U.S. ___, 143 S.Ct. 2355, 2375 (2023) (citation omitted). Rather, Congress must provide a clear statement entrusting the agency with such authority. *Id.*

82.    "[M]ajor questions cases 'have arisen from all corners of the administrative state, and administrative action resulting in the conferral of benefits is no exception to that rule.'" *Id.* (quoting *W. Va. v. EPA*, 597 U.S. at 721).

25

83.     The Placement Mandate is an attempt to assert unheralded regulatory power over an issue of vast economic and political significance. Each year, federal funding for foster care is in the billions, and that funding amounts to more than half of the States' budgets for foster care.[5] The federal government dictating to the States how to execute their police powers with respect to foster care would be an encroachment upon federalism of an "unprecedented nature." *See W. Va. v. EPA*, 597 U.S. at 721.

84.     The Social Security Act does not provide clear authorization for the Defendants to promulgate regulations like the Placement Mandate. *See supra* Count I.

85.     The Defendants try to avoid this fact by asserting the Placement Mandate does not violate the major questions doctrine because the rule "is not a 'transformative expansion in [its] regulatory authority,' but simply a clarification of how to apply a longstanding statutory requirement ["to place foster children in 'a safe setting' that is the most appropriate setting available consistent with 'the best interest and special needs of the child'"] to a specific subset of children in foster care." Final Rule at 34,853.

86.     But, as already discussed, the language relating to safe settings and the best interest and special needs of children is in a section discussing a responsibility clearly assigned to the States. *See* 42 U.S.C. §§ 675(5), 671(a)(16). Thus, it is clear this language cannot be used as a source of authority for the Defendants.

---

[5]    *Supra* note 3.

87.    Likewise, the authority given to the "Secretary to make and publish such rules and regulations as may be necessary to the efficient administration of the functions with which the Secretary is charged under the Social Security Act," Final Rule at 34,852 (cleaned up) (quoting 42 U.S.C. § 1302), cannot be used to assert authority for the Placement Mandate. This is so for two reasons. First, by the Defendants' own descriptions, the Placement Mandate is about ensuring safe and proper care for children asserting LGBTQI+ identity or status, not about efficient administration. *See generally* Final Rule (containing no reference to "efficiency" or "efficient" other than to cite 42 U.S.C. § 1302). Second, the rules and regulations that Congress gave the Defendants authority to promulgate are those that are necessary for the efficient administration of the functions with which the Secretary is charged. The Secretary has not been charged with any functions relating to standard setting or otherwise defining what constitutes safe and proper care. And the Placement Mandate goes way beyond what is necessary for the efficient administration of the non-discretionary approval required of the Secretary.

88.    The Social Security Act, therefore, does not provide a clear statement entrusting HHS or the Secretary with authority for the Placement Mandate. As such, the Final Rule violates the major questions doctrine.

89.    Even if the text of the enabling legislation were ambiguous, it would not be appropriate to find the Act delegated authority for the Placement Mandate to the Defendants. "[B]oth separation of powers principles and a practical understanding of legislative intent make [courts] 'reluctant to read into ambiguous statutory text' the

27

delegation claimed to be lurking there." *W. Va. v. EPA*, 597 U.S. at 723 (quoting *Util. Air*, 573 U.S. at 324). As the U.S. Supreme Court has explained, "[e]xtraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s].'" *Id.* (quoting *Whitman*, 531 U.S. at 468).

90.     The language cited by HHS and the Secretary for their authority, Final Rule at 34,852, is much too subtle a device for the novel and extraordinary mandate of the Final Rule, which would require States to supplant their own standards for foster care with those of the Defendants. Nothing in the phrase "best interest and special needs of the child" used in the context of a case review system the States are to create puts the States on notice that the Secretary and HHS could circumvent the system of cooperative federalism and require States to treat a child's gender identity or status as dispositive for foster care placement. 42 U.S.C. §§ 675(5), 671(16). Indeed, to the extent there is any question about what "best interests and special needs of the child" means, it has not meant a one-factor standard. *See, e.g.*, Ky. Rev. Stat. § 403.340 (setting out multiple factors to determine if a custody modification is in best interest of child); Ky. Rev. Stat. § 625.090(3) (directing courts to consider six factors when deciding whether termination of parental rights is in the best interest of the child).

91.     Even if the Defendants could make a plausible argument that phrases like "safe setting" and "best interest and special needs of the child" indicated the States could be directed to impose the substantive standard of the Placement Mandate, they need more than a "merely plausible textual basis for the agency

28

action;" they "must point to 'clear congressional authorization' for the power [they] claim[ ]." *W. Va. v. EPA*, 597 U.S. at 723 (citation omitted).[6] Here, they cannot.

92.    And the Court owes no deference to the interpretation of the enabling legislation asserted by HHS and the Secretary. "[T]he interpretation of the meaning of statutes, as applied to justiciable controversies, [is] exclusively a judicial function." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 387 (2024) (citation and quotation marks omitted); *see id.* at 392 (explaining that the APA "specifies that courts, not agencies, will decide '*all* relevant questions of law' arising on review of agency action").

93.    Lacking the clear Congressional authorization necessary for final agency action of vast economic and political significance, the Placement Mandate violates the major questions doctrine.

### COUNT III
### The Placement Mandate violates the Spending Clause.

94.    Kentucky incorporates by reference the allegations paragraphs 1 to 93, above, as if fully stated herein in their entirety.

95.    "The legitimacy of Congress' power to legislate under the spending power . . . rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). "States cannot knowingly accept conditions of which they are 'unaware' or which they

---

[6]    This is consistent with the nondelegation doctrine, which demands that Congress "lay down" an "intelligible principle" in an authorizing statute for the agency to follow. *Mistretta v. United States*, 488 U.S. 361, 372 (1989).

are unable to ascertain.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quoting *Pennhurst*, 451 U.S. at 17). Therefore, "Congress must provide 'clear notice' of the obligations a spending law entails." *Kentucky v. Yellen*, 54 F.4th 325, 348 (6th Cir. 2022) (quoting *Pennhurst* 451 U.S. at 25); *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 219 (2022) ("[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.") (citation omitted). Under this clear-statement rule, "Congress *itself* must have spoken with a 'clear voice.'" *Yellen*, 54 F.4th at 354 (quoting *Pennhurst*, 451 U.S. at 17).

96.    As discussed, Congress did not choose to impose standards for foster care provision like those in the Placement Mandate. *Supra* Counts I and II. Indeed, nothing in Title IV-E or IV-B puts the States on notice that the Secretary and HHS could circumvent the system of cooperative federalism explicitly recognized for foster care or make purported gender identity or status a dispositive factor. *See* 42 U.S.C. § 671(a)(10).

97.    Because Congress did not unambiguously impose the condition of making purported sexual orientation or gender identity status part of the mandatory considerations State agencies must make when determining foster care placement, the Defendants cannot impose such a condition through the Final Rule.

98.    Moreover, Congress' spending power "may not be used to induce the States to engage in activities that would themselves be unconstitutional." *South Dakota v. Dole*, 483 U.S. 203, 210 (1987). Yet, the Final Rule is likely to do just that.

99.     Many biological parents of foster children still retain parental rights, and those rights include the right to direct medical decisions of their minor children. *See, e.g., Kanuszewski v. Michigan Dep't of Health & Human Servs.*, 927 F.3d 396, 419 (6th Cir. 2019) (finding that "it is logically the parents who possess a fundamental right to direct the medical care of their children," and therefore, parents have a substantive due process "right to direct their children's medical care"). If a State acts in the manner required by the Placement Mandate and affirms the medical decisions of a child asserting a sexual orientation or gender identity inconsistent with her sex, *see* Final Rule at 34,835–36, without respecting the due process rights of the parents, it acts unconstitutionally.

100.     Compliance with the Placement Mandate may also induce some States to engage in activities that violate the First Amendment. The Defendants assert there are no infringements on religious freedom under the Final Rule because no individual providers are required to become Designated Placements. *Id*. at 34,820. They further note that the Placement Mandate is regulating the States, not individual providers. *See, e.g., id*. at 34,848. And to conclude, they simply say that, "insofar as the application of any requirement under the rule would violate applicable Federal protections for religious freedom, conscience, and free speech, such application shall not be required." *See id*. at 34,820. But the Defendants are willfully ignoring the real consequences of the Placement Mandate's requirements.

101.     The Placement Mandate defines retaliation in a way that certainly induces—if not requires—States to violate religious freedom. According to HHS and

31

the Secretary, it is impermissible retaliation if a provider does not allow a child who is asserting LGBTQI+ status or identity access to resources, activities, and peers that would support the purported identity. *Id.* at 34,835. This definition of retaliation applies not only to providers who have decided to be Designated Placements, but also to the State agency and "any provider." *Id.* at 34,860. This means that an individual foster care provider who, because of sincerely held religious beliefs, cannot affirm a child's purported gender identity or status and therefore, for example, does not permit the child to attend a "Pride Parade," would be found to have retaliated against the child under the Placement Mandate. But if States punish that foster care provider by not allowing the provider to participate in the foster care program or by removing that child from the provider's home, the State is violating the First Amendment. *See, e.g., Fulton v. City of Philadelphia*, 593 U.S. 522, 532 (2021) (finding that the City had burdened a foster care agency's "religious exercise by putting it to the choice of curtailing its mission or approving relationships inconsistent with its beliefs").

102.   Additionally, under the Final Rule, State agencies must have, at any given time, sufficient Designated Placements as well as congregate care institutions that will agree to place the children by gender identity rather than sex. *See* Final Rule at 34,859 ("The title IV-E/IV-B agency must ensure there is a Designated Placement available for all LGBTQI+ children in foster care who request or would benefit from such a placement."); *id.* at 34,848 ("[T]he rule places the responsibility on states and tribes—rather than providers—to find Designated Placements for LGBTQI+ identifying children."). Failure to do so means the State will lose the

funding that accounts for more than half of their budget for foster care. If States then begin only contracting with private agencies that are willing to have at least some Designated Placements or are willing to place children according to purported gender identity rather than sex and thereby excludes organizations and individual foster families who object on religious grounds to placing children by gender identity inconsistent with sex, the States violate the guarantees of religious freedom protected by the First Amendment. *See Fulton*, 593 U.S. at 536 (explaining it has never been the case that "the government may discriminate against religion when acting in its managerial role").

103.    Just as Congress could not impose a condition on federal funds that would induce or result in Kentucky violating constitutional rights, the Defendants certainly cannot either.

**COUNT IV**
**The Placement Mandate is arbitrary and capricious.**

104.    Kentucky incorporates by reference the allegations in paragraphs 1 to 103, above, as if fully stated herein in their entirety.

105.    Under the Administrative Procedure Act, agency action cannot be arbitrary or capricious. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). This means that, *inter alia*, the agency cannot rely on "factors which Congress has not intended it to consider," and it cannot "entirely fail[ ] to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Defendants have violated both of these principles.

106. As already discussed, nothing in the enabling statutes evinces Congress intended for HHS or the Secretary to establish substantive standards for foster care or to mandate States treat purported gender identity or status as the dispositive factor for foster care placement. *Supra* Count I. The lack of authority for the subject of the Placement Mandate makes it arbitrary.

107. Furthermore, it is the responsibility of the agency to "give clear indication that it has exercised the discretion with which Congress has empowered it." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). HHS and the Secretary try to justify the Final Rule by asserting it is "necessary" to meet the Secretary's "responsibility" to ensure Title IV-B/IV-E agencies meet the statutory mandates. Final Rule at 34,852. They assert the Secretary's authority to "make and publish such rules and regulations . . . as may be necessary to the efficient administration of the functions with which the Secretary is charged under the Social Security Act" is how the Secretary can meet this responsibility. *See id.* (quoting 42 U.S.C. § 1302) (cleaned up). But the Secretary has no function relating to establishing substantive standards for foster care placement, so it is impossible that the authority to publish rules and regulations to aid the efficient administration of the functions assigned to him authorizes the Placement Mandate. The Final Rule fails to address this obstacle,[7] and therefore, fails to meet the Defendants' burden of giving clear indication they have exercised discretion given to them by Congress.

---

[7]    Indeed, it barely addresses the issue of its authority at all. Less than a page of the Federal Register is devoted to discussing the legal authority for the Placement Mandate in the Executive Summary.

34

108.    Even if the Defendants had authority for the Placement Mandate, they have failed to articulate a satisfactory explanation for why they are imposing it on the States. An agency "must 'disclose the basis of its order'" and "must make findings that support its decision, and those findings must be supported by substantial evidence." *Burlington*, 371 U.S. at 168 (citations omitted). HHS does indeed discuss research, studies, interviews, and testimony that it asserts "makes clear" foster youth asserting an LGBTQI+ status "do not currently receive placements or services that are safe and proper." Final Rule at 34,822. But this determination is based on the unexplained and seemingly unsupported belief by the Defendants that affirming LGBTQI+ status makes a placement "safe and proper." They do not provide a satisfactory explanation as to why that is the case under statute or in experience. The failure to do so makes the Final Rule arbitrary and capricious.

109.    The Defendants have also failed to consider important aspects of the problem. For instance, they explain that State Title IV-B/IV-E agency case plans:

> must include a plan for assuring that the child receives safe and proper care and that services are provided to improve the conditions in the parents' home, facilitate return of the child to his own safe home or the permanent placement, and address the needs of the child while in foster care.

Final Rule at 34,820. Yet, they never explain how affirming sexual orientation or gender identity inconsistent with sex during foster care will "improve the conditions in the parents' home" or "facilitate return of the child" to that home. This failure is

---

Final Rule at 34,820. It spends just over one page discussing the statutory authority when addressing comments submitted by State Attorneys General in response to the proposed rule—and that was only because it largely repeated earlier language. *Id*. at 34,850–51.

made glaringly obvious because the Final Rule requires notice of the opportunity to be placed in a Designated Placement to be given to children who "have been removed from their home due, in whole or part, to familial conflict about their sexual orientation, gender identity, gender expression or sex characteristics." *Id*. at 34,860. The only response by the Defendants to a comment that the Final Rule did not account for the preferences of parents whose rights are intact, was that they "expect that agencies will act with appropriate awareness of parental rights under the law of the applicable state or tribe." *Id*. at 34,837. That is not consideration; it is complete avoidance of consideration.

110.    The Defendants similarly attempt to avoid addressing potential conflicts relating to medical care. The preamble explains that the Placement Mandate "does not establish any standard of medical care." *Id*. at 34,836. And the Defendants acknowledge—as they must—that the Title IV-E agencies are the ones who will determine what services to provide. *See id*. They also note that the Placement Mandate "requires access only to those services and supports that are lawful in the state." *Id*. at 34,852. Yet, the rule defines prohibited retaliation to include "attempts to undermine, suppress, change, or stigmatize a child's sexual orientation or gender identity or expression through 'conversion therapy.'" Final Rule at 34,860. Some parents—both biological and foster parents—may feel that the therapy the Defendants call "conversion therapy" is the best medical route for the child, and some States certainly treat it as a lawful service. The Defendants ignore this potential conflict. Indeed, as discussed, the Placement Mandate completely ignores the rights

of biological and foster parents to determine or be involved in the medical treatment of the child. *Supra* Count III; *see* Ky. Rev. Stat. § 620.360(1)(m). The failure to consider these issues makes this final agency action arbitrary and capricious.

111.    Also unheeded by the Defendants is the practical effect of the Placement Mandate, which is to reduce the number of available foster care providers. The Placement Mandate usurps the role of the States in contravention of Congress' intent so the Defendants can impose a nationwide standard requiring the prioritization of asserted gender identity or status over all other factors and forbid any foster care provider from restricting access to activities and persons supportive of that status. Foster care providers unwilling to relinquish their rights under this scheme will no longer participate in the State foster care program, thereby reducing the already too-small number of foster care providers. The Defendants acknowledge that States will likely have to recruit new foster care providers, Final Rule at 34,855, but fail to consider at all the impact on children if there are not enough foster care providers available. This failure to consider how the Final Rule might affect the continued operation of the Commonwealth's foster care system and the children involved, makes the Placement Mandate arbitrary.

## PRAYER FOR RELIEF

WHEREFORE, the Commonwealth of Kentucky respectfully ask this Court to:

1.    Declare the Final Rule is unlawful because it was promulgated in excess of statutory authority, violates the major questions doctrine and the Spending Clause, and is arbitrary and capricious;

37

2.   Vacate and set aside the Final Rule in its entirety;

3.   Issue injunctive relief prohibiting the Defendants from implementing, applying, enforcing, or otherwise proceeding on the basis of the Final Rule;

4.   Award the Plaintiff reasonable costs and fees, including attorney's fees, pursuant to any applicable statute or authority; and

5. Grant the Plaintiff such additional relief that the Court deems appropriate.

Respectfully Submitted,

**Russell Coleman**
**ATTORNEY GENERAL**

_/s/ Lindsey R. Keiser_
Victor B. Maddox
Aaron J. Silletto
Lindsey R. Keiser
Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Phone: (502) 696-5300
justind.clark@ky.gov
Victor.Maddox@ky.gov
Lindsey.Keiser@ky.gov

_Counsel for the Commonwealth of Kentucky_